(37 South. 531.)

No. 15,179.

ATLAS FEED PRODUCTS CO. v. CITY OF NEW ORLEANS.

(Nov. 21, 1904.)

TAXATION—EXEMPTIONS—FLOUR AND FEED.

1. The word "flour," in article 230 of the Constitution of 1898, in reference to exemption from taxation, is used in a restricted or special sense, as "the ground and bolted substance of wheat manufactured for human consumption"; and the word "feed," which has been adopted by the plaintiff corporation as descriptive of and characterizing the business in which it was engaged, has also a special meaning. It signifies a "food for cattle."

2. The grinding of the cereals which passed through plaintiff's mill was but the initial step towards the production of the articles whose sale was the object and purpose of the creation of the corporation. Not a pound of "flour," in the sense in which that term is used in the Constitution, has been sold by it.

Plaintiff's claim to exemption is not well founded.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by the Atlas Feed Products Company against the city of New Orleans. Judgment for defendant. Plaintiff appeals. Affirmed.

James Barkley Rosser, Jr., for appellant. Samuel Louis Gilmore, City Atty., and Frank Bartlett Thomas, Asst. City Atty., for appellee.

Statement of the Case.

NICHOLLS, J. The petition of the plaintiff sets out that it is a corporation, organized under the laws of Louisiana, engaged in the manufacture of flour from grain and cereals, in the city of New Orleans; that, as a manufacturer of flour, the capital, machinery, and other property employed by it in said business are exempt from taxation under the Constitution and laws of Louisiana, particularly article 230 of the Constitution of 1898; that not less than five hands are constantly employed in said factory; that, notwithstanding its exemption from taxation, the city of New Orleans is illegally attempting to enforce the collection of an illegal tax, based upon an illegal assessment for the year 1903, upon merchandise $1,000, machinery $5,000; said tax claimed by the city of New Orleans amounting to the sum of $138, interest, and costs; that it had received notice from the treasurer of said city that in de-

fault of payment of same within three days he would seize and take into possession so much of said movable property as would be necessary to pay said amount; that, in order to protect itself against said seizure and resulting loss and damage, a writ of injunction was necessary, restraining the seizure, and to have judgment decreeing said assessment null and void, and declaring the exemption of said property from taxation. It prayed for citation of the city of New Orleans for the issuing of the injunction alleged to be necessary; that judgment be rendered in its favor decreeing it exempt from taxation under article 230 of the Constitution; also decreeing the said assessment to be null and void, and ordering its cancellation. Upon the reading of the petition, a rule nisi was directed to the treasurer of the city of New Orleans to show cause why a writ of injunction should not issue as prayed for. At the trial of this rule it was agreed that the case be tried upon its merits, as well as upon the matter of injunction. The district court declared that the evidence and the law was in favor of the defendant. The writ of injunction applied for was denied, and plaintiff's suit dismissed. After an unsuccessful application for a new trial, plaintiff appealed.

The plaintiff was organized by notarial act before Soniat, notary public, on the 30th of May, 1902. Article 2 of its charter declared and specified the purposes for which the corporation was established, and the nature of the business to be carried on as to be "to manufacture all kinds of feed from grain and other products and getting therefrom all the bi-products obtainable; to acquire and purchase factories for the above named purposes in the city of New Orleans, State of Louisiana, and in any other city, county or parish in the United States; to maintain and operate such other factories and works that may be necessary for the purposes of this corporation."

On the 23d of July, 1903, the said second article of the charter was amended so as to read as follows:

"The purpose for which this corporation is established and the nature of the business to be carried on by it, are declared and specified to be the establishment and maintenance of a flouring mill in the city of New Orleans; the manufacture of flour from different edible grains and pulse, and the manufacture therefrom of various food and bi-products; to acquire and purchase factories for the above purposes in the city of New Orleans, State of Louisiana, and in any other city, county or parish in the United States; to maintain and operate such factories and works that may be necessary for the purposes of this corporation."

Article 230 of the Constitution of 1898, upon which the plaintiff relies, declares:

"There shall also be exempt from parochial and municipal taxation for a period of ten years from the first day of January, 1900, the capital, machinery and other property employed in the manufacture of * * * flour * * * provided that not less than five hands are employed in any one factory."

Only two witnesses were placed upon the stand by the plaintiff, W. S. Ellis and John A. Wogan, the latter being president of the corporation, the former employed by the corporation as its miller.

On direct examination the latter stated that the product of the mill of the Atlas Feed Company was flour, and what they termed "tailings." In going through the bolt or sieve, what passes through is the former product, and what goes over are the tailings. It is simply a grade of flour. The grains ground into flour by the mill are corn, oats, and wheat.

On cross-examination the following questions were asked and answers given:

Q. What do you make out of the oats after it is turned into a manufactured article?
A. You want to know what they are all made into?
Q. I want to know about the oats.
A. You take two different kinds of products.
Q. What?
A. Well, the flour is made into one product, and the tailings are made into feed.
Q. What is the product in its manufactured state ready to be marketed? What is that?
A. We make two kinds; one of them is an eastern product or a foreign product, and the other is manufactured here into feed.

Q. What is the product manufactured for the foreign market called?

A. Nutrine.

Q. Is it a food product?

A. Yes, sir, for cows.

Q. For cattle?

A. Yes, sir.

Q. Then, as I understand it, you take oats, you take corn, and you take wheat, and you manufacture out of the combination of these three cereals what is called "nutrine"?

A. Yes, sir.

Q. What is the consistency of nutrine?

A. It is flour from the three different grains, with molasses.

Q. Does it come out in a cake?

A. No, sir.

Q. Does it come out in a mass? * * * If I put liquids into a flour of ground cereals of any kind I make a mass.

A. A dough. * * * Here is some samples (witness producing them).

* * * * * * *

Q. As I understand it, this nutrine is limited in its purpose or use?

A. Yes, sir; really there is no limit to it. You can feed it to anything, but it is manufactured for a specific purpose.

Q. What is that?

A. For milch cows.

Q. For feeding to milch cows?

A. Yes, sir.

Q. It is on a parallel with the manufacture of cotton-seed meal products, cotton-seed meal and cake?

A. Well, they feed that, of course, for a great many purposes, for fattening, as well as sustaining life; but this is more especially to produce milk.

Q. This is not a flour in the common acceptation of the word? It is not an edible flour?

A. No, sir; that is, the grains it is made from—

Q. How long has this factory been in existence?

A. It commenced operations two years last October.

* * * * * * *

Q. * * * What other business is carried on besides the manufacture of this nutrine?

A. Just the manufacture of feed; that is all in connection with this.

Q. What feed?

A. Wogan Bros.' stock feed.

Q. Made out of what?

A. The refuse from this.

Q. It is a kind of by-product?

A. Yes, sir. * * * It is what is left from the flour * * * made with molasses, the same as this; only, of course, it is a coarse substance or bran—the middling or coarse part.

### Redirect Examination.

* * * * * * *

Q. This is what you call nutrine of a different grade?

A. * * * There are a great many grades; when any kind of cereal is produced—

Q. I want to know if this is a flour mill—if the product of that mill is flour or not?

A. A portion of it is flour; a portion of that product is flour.

Q. What is the other portion?

A. Feed.

Q. I understand you to say that this was mixed with molasses?

A. Yes, sir.

Q. As a miller, will you state whether this is flour of its kind, before it is mixed with molasses?

A. Yes, sir.

Q. Could it be used for human consumption?

A. No, sir.

Q. I mean before it is mixed with molasses?

A. Not as a combination, it couldn't.

Q. Not as a combination?

A. No, sir.

Q. What is this made from?

A. Corn, oats, and wheat. I didn't state before that there was cotton-seed meal in it; I didn't think of it.

Q. Before this combination and mixture is made, is the product of that mill a flour?

A. Yes, sir.

Q. Before it is mixed with cotton-seed meal and the molasses, is it a flour such as can be used for human consumption?

A. It is used all over the United States and all over the world.

Q. Do you know that of your personal knowledge?

A. Yes, sir.

* * * * * * *

John A. Wogan, president of the corporation, testified that the business carried on by it was manufacturing nutrine and stock feed. Nutrine is a flour. The mill grinds cereals into flour. The product is sifted and made into a flour, and then into nutrine, and the tailings into stock food. The mill is used for the manufacturing of the products of the company—nutrine and stock food. The nutrine is made out of crushed grain, corn, and wheat sifted, mixed with cotton seed meal and molasses. The crushed grain or cereals, when it comes from the mill, is a flour. This flour is afterwards manufactured into what is called "nutrine." It could be sold as a mixture without making nutrine, but "we find it more profitable" to make it into nutrine and sell it as nutrine.

On cross-examination witness testified that the business was not specially the manufacturing of feed products for feeding cattle; the company could sell flour if it found it

more advantageous, but it has not yet done so. Its business was the selling of this product nutrine to be used as cattle feed, but not exclusively as cattle feed. The company could sell the product without mixing it, but had not yet done so. It found it more profitable to use it in conjunction with the other stuff, molasses and cotton seed meal. That is all that is used—grain, molasses, and cotton seed meal. The mill does not make the flour like a patent flour. The flour from wheat is the only one used for human consumption.

"Q. You don't mean that you could sell it for the purpose of making ordinary bread?
"A. Well, we could sell corn, flour, or oat flour.
"Q. That would be used in what way? How could that kind of flour be used?
"A. For human consumption."

Bread could be made out of it, and for the other purposes that flour is used for in the condition in which it is turned out from the mill; that is, before it is mixed with cotton seed meal and molasses and made into nutrine. Before it is mixed with molasses and cotton-seed meal it is a flour, and can be used for human consumption.

### Opinion.

We are of the opinion that the judgment appealed from is correct. The word "flour" is thus defined in the Standard Dictionary of the English Language:

"1st. The ground and bolted substance of wheat. In the United States the unqualified term has this meaning both in common and commercial usage.
" 'For if the flour be fresh and sound,
" 'Who careth in what mill 'twas ground?'
  —"Longfellow's Wayside Inn, pt. 11, 4th Interlude, at 2.

"2nd. The finely ground substance of any cereal, usually as separated from the husk. In this sense the kind of cereal used is generally specified, as rye flour, buckwheat flour.
"3rd. Any finely powdered substance, as flour of emery.
"4th. A loose, finely crystallized condition of saltpeter used in making gunpowder.
"(Earlier spelling of flour, 'Floure.')"

The word is used in article 230 of the Constitution in the restricted or special sense of the ground and bolted substance of wheat manufactured for human consumption.

It is very apparent that the product made by the machinery and appliances whose exemption from taxation was sought was neither manufactured nor sold for the purpose of human consumption, but as a feed for cattle. This is shown by the name of the corporation, which is still retained, and by the action of the corporation from the time it was organized up to the present time. It is shown that not a pound of the flour, whose manufacture the Constitution intended to encourage, has been sold by it, but that the grinding of such cereals as passed through the mill was but the initial step towards the production of the articles whose sale was the object and purpose of the creating of the corporation. It will be time enough to raise the question of the exemption of particular machinery as employed in the manufacture of flour in the meaning of the Constitution when some portion of its product has, at least, been in fact sold for human consumption.

Not only has the word "flour" a special meaning, but so also has the word "feed," which has been adopted by the plaintiff corporation for its name, as descriptive of and characterizing the business in which it was to be engaged. It signifies a food for cattle.

The amendment to article 2 of the company's charter was made later in the year 1903, after the assessment was closed. It could have no effect on the assessment for 1903, even could it have any effect upon later assessments.

Counsel urge that the machinery by which the ground products were manufactured is distinct from that by means of which they were later mixed with molasses and cotton seed meal, but had that fact, under the circumstances of this case, been important, it has not been shown, nor has the relative values of the two kinds of machinery.

It is claimed that the testimony shows that the number of hands employed in the factory was sufficient to carry the exemption claimed, but if the business of mixing the products from the mill with the molasses and cotton seed meal was distinct from that of grinding the cereals, the testimony does not show how many hands were employed in one business and how many in the other.

The judgment being correct, it is hereby affirmed.