as in case of nonsuit. There is no prayer by the city for an amendment.

The judgment appealed from is, accordingly, affirmed.

---

(44 South. 325.)

No. 16,580.

SHREVEPORT CREOSOTING CO., Limited, v. CITY OF SHREVEPORT et al.

(May 27, 1907. Rehearing Denied June 29, 1907.)

1. TAXATION—EXEMPTIONS—PRESUMPTION OF CONTINUANCE—INJUNCTION.

Plaintiff, claiming that it was exempted from parochial and municipal taxation for 1906, and three years thereafter, under article 230 of the Constitution, as manufacturers of articles of wood, enjoined the assessing and taxing collecting officers from assessing its property and collecting taxes thereon. The district court recognized the right of exemption and perpetuated the injunction.

Held, on appeal, that the judgment is erroneous. The judgment is set aside, and the injunction dissolved. The court will not by its present decree adjudge a corporation exempt from taxation for future years. Conditions existing in one year may be entirely different in the next.

2. SAME—MANUFACTURES.

Conditions existing in the year 1906 did not justify plaintiff's claim for an exemption from taxation for that year. The creosoting process on which its right to exemption was predicated was applied to cross-ties already existing as articles of wood, and which it had purchased from a company which had already made them. The process in question was not creative in character, but merely preservative.

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Thomas Fletcher Bell, Judge.

Action by the Shreveport Creosoting Company, Limited, against the city of Shreveport and others. Judgment for plaintiff, and defendants appeal. Reversed, and demand dismissed.

James Martin Foster, Dist. Atty., and Ruffin Golson Pleasant, City Atty., for appellants. Pugh, Thigpen & Foster, for appellee.

NICHOLLS, J. The plaintiff prayed for and obtained a writ of injunction against the defendants, sheriff and city comptroller, restraining them from collecting parish and municipal taxes on its land and plant for the year 1906. The tax assessor was also made a party defendant so as to obtain a decree contradictory with him, declaring said property exempt from parish and municipal taxation for future years.

The petition alleged, in substance: That the corporation was engaged in the manufacture of cross-ties, telephone, and telegraph poles, bridge timbers, and other articles of wood, all in a finished state and ready for convenient, immediate, and general use and sale without further manipulation; that it employed more than five hands in the manufacture of said material, and that all of its capital, machinery, and other property employed in said manufacturing enterprise was exempt from parochial and municipal taxation for a period of 10 years dating from January 1, 1900, as provided by article 230 of the Constitution of 1898; that, in order to put said manufacturing enterprise into operation, it bought considerable real estate situated in the city of Shreveport and in the parish of Caddo, and all of said land was absolutely necessary for the location of said plant, and for switches and side tracks, necessary and essential for the operation of said plant; that the land bought for the location and operation of said plant consisted of about 55 acres, all of which was used exclusively for the location and operation of the plant; that the state taxes on said property had been paid or tendered; and that the assessment for year 1906 for parish and municipal taxation was illegal, null, and void, for the reason that same was exempt from such taxation.

The tax collector, the representative of the city, and the assessor were made parties defendant, and under suitable allegations an in-

junction was issued restraining the collection of the parish and municipal taxes for the year 1906.

All of the defendants filed answers denying the exemption from taxation of property owned by the plaintiff.

Upon these issues the case was heard in the court below, and from a judgment in favor of the plaintiff, decreeing the whole of the capital, machinery, and other property employed in its manufacturing plant exempt from parish and municipal taxation, not only for the year 1906, but up to and including the years 1909, all of the defendants have appealed.

The following are the positions advanced in the brief of the plaintiff:

(1) Article 230 of the Constitution exempts from taxation the capital, machinery, and other property "employed in the manufacture of furniture and other articles of wood." Articles of wood in this article refer to a particular substance or commodity manufactured from wood by hand, by art, or machinery ready for immediate, convenient, and general use, complete in themselves without further manipulation or work on them. Carpenter v. Sheriff, 45 La. Ann. 456, 12 South. 483; Whited v. Assessor, 49 La. Ann. 325, 21 South. 538; Globe Lumber Co. v. Assessor, 110 La. 438, 34 South. 595.

(2) There can be no doubt but what cross-ties, bridge timbers, such as treated by the plaintiff, telephone and telegraph poles are "articles of wood," within the meaning of the Constitution, and, if the Creosoting Company manufactures them, it is within both the letter and spirit of the constitutional exemption.

(3) A manufacturer is not one who creates out of nothing for that would surpass human power; neither is he one who produces a new article out of materials entirely raw. He is one who gives new shapes, new qualities, new combinations to matter which has already gone through some artificial process. City v. Le Blanc, 34 La. Ann. 596; City v. Ernst, 35 La. Ann. 746; Carlin v. Western Assurance Co., 57 Md. 526, 40 Am. Rep. 440; State v. Sugar Refining Co., 108 La. 628, 32 South. 965; Norris Bros. v. Com., 27 Pa. 494.

(4) Very few of the articles now known as manufactured could properly be called so within the original and strict meaning of the term, as shown by its derivation. It is a word which, in the vicissitudes of language, has come to signify the reverse of its intrinsic meaning. Modern lexicographers, scientific works and the jurisprudence of the country have given it a broad, liberal, and legal meaning, expanding it so as not only to include one who gives new shapes to raw material, but also to one who gives the raw material thus prepared new qualities and new combinations. City v. Le Blanc, 34 La. Ann. 596; City v. Ernst, 35 La. Ann. 746; City v. Refining Co., 108 La. 628, 32 South. 965; State v. Dupre, 42 La. Ann. 561, 7 South. 727.

(5) To constitute the plaintiff a manufacturer of cross-ties, "other articles of wood," it is not essential that it should go into the forest, fell the trees, and put the raw material into proper form and shape, as this would not complete the tie for ready sale and use. The timber from which such ties are made is not such as could be used. The felling of the trees and the reduction of the timber to proper shape is only one step in the process of manufacture. The treating process has to be applied before the tie is ready to be delivered to the consumer for use.

(6) The proof shows that the sap or gum tie, treated by the plaintiff, is without value in a commercial sense as a cross-tie, but that, after undergoing the creosoting process, is of great value and becomes one of the most important factors in the construction and maintenance of railroads. The treatment is accomplished by a mechanical and chemical

process; and, since it gives new life, new qualities, and new combinations to the material, it follows that such treatment constitutes the plaintiff a manufacturer of "articles of wood," within the meaning of the constitutional exemption.

(6) Soon after the adoption of the Constitution of 1879, the courts gave the word "manufacture" a broader and more liberal meaning than that imported by the ordinary lexicographic meaning assigned to the term, and brought within its grasp not only the labor of putting the raw material into shape and form, but also expanded its meaning so as to include the process of giving the material new qualities, substances, and combinations. This enlarged construction was recognized before the adoption of the Constitution of 1898, and since that Constitution retained the same language, thus construed and applied, this construction must be considered to have had the sanction of the convention, as the contrary does not appear. State v. Brewer, 22 La. Ann. 273; Globe Lumber Co. v. Clement, 110 La. 438, 34 South. 595; DaPonte v. Assessors, 35 La. Ann. 655; Crescent Bed Company v. City, 111 La. 124, 35 South. 484.

(7) The argument for an enlarged and liberal construction or interpretation of the word manufacture does not militate against the concession that the words "articles of wood" are not to be construed in their larger signification, for it is settled by well-known rules of statutory interpretation that they are to be referred to the particular words which they immediately follow, and can only include other "articles of wood" or things ejusdem generis with those specifically enumerated. The word "other," as used in the Constitution, as qualifying "articles of wood," contributes to give a restrictive sense to the words "articles of wood," and limits the exemption from taxation to "other articles of wood," such as furniture and other like articles. City v. Le Blanc, 34 La. Ann. 596; Jones v. Raines, 35 La. Ann. 998; Martin v.

New Orleans, 38 La. Ann. 398, 58 Am. Rep. 194; Carre v. New Orleans, 41 La. Ann. 996, 6 South. 893.

(8) While the question was not specially put at issue in the lower court, yet it has been suggested that, inasmuch as the plant was not completed at the date of the assessment, it is not exempt from taxation for the year 1906. While the authorities are meager on this point, and while the question may be considered as res nova in this state, yet no good reason can be suggested why the exemption should not extend to property intended for manufacturing purposes, if otherwise exempt, where the plant is in good faith in process of construction. Amer. & Eng. Ency. of Law, vol. 12, 329.

Finally, the business in which the plaintiff is engaged, coming within the modern lexicographic, scientific, and legal definition of the terms "manufacture" or "manufacturing," entitles it absolutely and unconditionally to the exemption herein claimed.

Defendant, on the contrary, insists that:

(1) Taxation of all property being the rule, and exemptions the exception, exemptions will never be presumed or implied in reference to property which would be subject to taxation without some express grant of immunity. And, even in cases where it is claimed that there has been an express grant of exemption, it is an invariable rule that every presumption must be in favor of a continuance of the taxing power and against any surrender thereof. Am. & Eng. Ency. of Law (2d Ed.) vol. 12, p. 286, III; Id. p. 288 (2); Id. p. 302; Atlantic & Pacific R. Co. v. Lesueur, 19 Pac. 157, 2 Ariz. 428, 1 L. R. A. 244; People v. Wemple, 29 N. E. 808, 129 N. Y. 543, 14 L. R. A. 708; Young Men's Christian Assn. of Omaha v. Douglas County, 83 N. W. 924, 60 Neb. 642, 52 L. R. A. 123; Knoxville & Ohio R. Co. v. Harris, 43 S. W. 115, 99 Tenn. 684, 53 L. R. A. 921; Adams v. Yazoo & M. V. R. Co., 24 South. 200, 317, 28 South. 956, 77 Miss. 194, 60 L. R. A. 33; Yazoo

& M. V. R. Co. v. Thomas, 132 U. S. 174, 10 Sup. Ct. 68, 33 L. Ed. 308; Thompson, Corporations, § 5571.

(2) Exemptions from taxation are strictly construed. City of New Orleans v. New Orleans Coffee Co., 46 La. Ann. 86, 14 South. 502; Carre v. City of New Orleans, 42 La. Ann. 1121, 8 South. 399; Id., 41 La. Ann. 998, 6 South. 893.

(3) Exemption from taxation is strictly construed and cannot be extended by implication. Victoria Lumber Co. v. Rives, 115 La. 996, 40 South. 382.

(4) The surrender of the power of taxation is never presumed. Benedict v. City of New Orleans, 44 La. Ann. 793, 11 South. 41.

Doubt must be solved in favor of the power to tax. Amer. & Eng. Ency. of Law (2d Ed.) vol. 12, p. 2.

(5) Burden of proof: The one who claims an exemption assumes the burden of proof, and must clearly and satisfactorily establish an exemption exists, and that the property for which it is claimed is within its scope. Id. p. 296 (3).

(6) The importer of shooks or staves, already bent so as to form a barrel, or barrel heads ready for insertion, and of hoops ready to be driven, is not a manufacturer of a barrel, although he substitutes machinery for hand labor in setting up the staves in barrel shape, introducing prepared heads and driving on the hoops, after subjecting the material to a heating process, and the machinery and property thus employed are not exempt under article 207 of the Constitution of 1879. Brooklyn Cooperage Co. v. City of New Orleans, 47 La. Ann. 1314, 17 South. 804; Chickasaw Cooperage Co. v. Police Jury of Parish of Jefferson, 48 La. Ann. 523, 19 South. 476.

(7) One who prints billheads, orders and other forms for commercial purposes on paper bought by him and who cuts and folds the paper into shapes for such purposes, as well as to serve for ledgers and commercial books, is not a manufacturer of stationery, entitled to exemption from taxation. Patterson & Ray v. City of New Orleans, 47 La. Ann. 275, 16 South. 815.

(8) The making of soda, seltz, and similar drinks is not within the constitutional exemption of property employed in manufacturing chemicals. Crescent City Seltz & Mineral Water Co. v. City of New Orleans, 48 La. Ann. 768, 19 South. 943; New Orleans v. New Orleans Coffee Co., 46 La. Ann. 86, 14 South. 502; State v. Eckendorf, 46 La. Ann. 131, 14 South. 518. Yet the constituent elements of these compounds, brought together, from a new combination and serve new purposes.

(9) The importer of the several pieces of the umbrella is not a manufacturer. The exemption is of textile fabrics and not of articles prepared elsewhere and brought here to be given the finish and shape of the umbrella. Lake Bros. & Co. v. Guillotte, 48 La. Ann. 870, 19 South. 924.

(10) The Constitution contemplates manufactories that produce an article, not a mere addition or mode of use of an article already manufactured. State v. Eckendorf, 46 La. Ann. 131, 14 South. 518.

(11) Capital, etc., employed in the manufacture of shoe uppers, is not employed in the manufacture of leather, nor in the manufacture of shoes, and is not exempt under article 207 of the Constitution of 1879. A. G. Ricks & Co. v. Board of Assessors, 43 La. Ann. 1075, 10 South. 202.

(12) The capital and machinery of the creosote plant is not employed in giving shape and finish to the cross-tie. It merely saturates the outer portion of the tie after it had been given shape and finish elsewhere.

(13) Articles of wood "in article 207 of the Constitution refer to a particular substance or commodity manufactured from lumber, by hand, by art, by machinery, ready for immediate, convenient and general use, complete in themselves, without further manipulation." White Castle Lumber & Shingle Co. v. Browne,

45 La. Ann. 454, 12 South. 485; Carpenter v. Brusle, 45 La. Ann. 456, 12 South. 483; Plaquemine Lumber & Improvement Co. v. Browne, 45 La. Ann. 459, 12 South. 485. A bridge timber is not a "commodity" ready for "general use." A cross-tie already made does not afterwards become a particular substance or commodity manufactured from lumber "simply because it is creosoted."

(14) If some of the products will be found to be exempt and some not exempt, the court will indicate the proportion, provided the evidence clearly shows the proportion; otherwise the whole must be taxed. Washburn v. New Orleans, 43 La. Ann. 226, 9 South. 37; Victoria Lumber Co. v. Rives, 115 La. 996, 40 South. 382.

(15) Longer life given to a timber by the application of any kind of process whatsoever does not give it a new quality; it merely enlarges a quality it already possesses.

(16) Cross-ties, bridge timbers, and telephone poles do not serve new purposes when creosoted. They are still cross-ties, bridge timbers, and telephone poles.

G. W. Signor, the president of the company, testified as follows:

That he was the president of the Shreveport Creosoting Company, Limited. That the charter of the company shows that it was organized in the spring of 1906. That some time before the charter was prepared the incorporators entered into a preliminary organization and bought some of the land for the location of the plant. "The first 10 acres of land bought was not enough for the construction of the plant, and when we bought it we had in view the 13 acres known as the Jane H. Riggins land and the 27 acres known as the Smith tract, both of which adjoin the first-mentioned tract. These two last tracts we bought after the company was regularly organized. As soon as the preliminary agreement was entered into, we employed competent engineers to draw plans and specifications for the construction of the plant. As soon as the details of any part were finished, we immediately placed orders with the manufacturers for the necessary machinery and building material. We began the actual construction of the plant in June, 1906, and have been pushing it from that time to the present as fast as money and men could push it. We laid about five miles of track on the company's grounds in the summer of 1906, and actually began creosoting ties the latter part of December, 1906, and we are now in active operation. We are using one cylinder, and have two others about ready for service. All the land which we have purchased is necessary for the proper construction and operation of a creosoting plant of the capacity of ours. We need large trackage facilities and much storage space. We expect, in fact, to extend our trackage space, and, while we can probably get along for the present with the grounds which we have, yet, if we materially enlarge the capacity of our plant, we will be compelled to purchase additional land. There is an old residence on a part of the ground that we bought. It is not used for purposes of revenue. We allow our superintendent to occupy it, so as to have him on the premises at all times. We do not expect to lease out any of this land, or to use it for any purpose other than that for which it was bought. We creosote ties, bridge timbers, and telephone poles: We get out the cross-ties ordinarily from sap pine. This character of wood is of no value unless creosoted. We have these ties cut from the forests and hewn into shape generally eight feet long and six by eight inches. For the telephone poles we use sap pine called 'poles.' They are cut the required length, and peeled, roofed, and grained, and then creosoted. They are taken from the creosoting process, and are then ready for immediate use without additional labor. The same is true of the cross-ties. The ordinary pine tar and telephone or telegraph pole, without undergoing the creosoting treatment that we apply, is of no value; but, after being treated, they will last from 15 to 25 years.

"We manufacture bridge timbers by a similar process. The railroad furnishes the plans and specifications for the timbers, and we cut the timbers according to such plans, and then creosote them, and when we deliver them to the railroad every piece is cut and lined to the specifications and ready for immediate use. It is necessary to put the tie telegraph or telephone pole or bridge timbers into a finished state before the creosoting is applied. The telegraph pole is roofed and grained; that is, it is beveled at the top so as to shed the water, and dappled out to receive the cross-arms upon which the wires are placed. The bridge timbers have to be cut to specifications; that is to say, that not only have they to be of the size and length specified, but they are fitted and bored, ready to be put together. When so manufactured, they need no further manipulation, but are ready to be placed or put in the bridge.

"It is necessary to prepare all timbers ready for use, for the reason that, if the fittings were made after the timbers were creosoted, you would take from the protective value of the stick which is at the outside in very large timbers, such as are used in the construction of railroad trestle or bridge work. The protective quality of the process, in large timbers, is from one to two inches in depth, and, if this should be cut through, it would expose the unprotected part of the timber, and to that extent destroy its value. Of course, in smaller sized timbers, the creosote practically permeates every part of

the timber; but as before stated it is a very difficult matter to press the creosote entirely through all parts of the large timbers.

"The machinery alone, when fully completed, will cost about $100,000. We paid 50 for the land. We will employ from 100 to 300 laborers. We are now employing from 50 to 75 skilled and unskilled laborers.

"To secure ties and other timbers used in this enterprise for bridge timbers, we get them out of the woods, hew them into proper shape, and we buy the sawed timbers from the mills. We have the timbers shipped to our plant at Shreveport, and before applying the creosoting process we get them into proper lengths, and otherwise finish them, as before stated, before we put them into the cylinder to receive the creosoting process. We buy timbers for cross-ties anywhere that it can be found, and hire people to go into the woods and chop down the trees, cut the ties to the ordinary dimensions, and ship them to the plant and unload them on our storage grounds, and then apply to them the treatment. In many instances we make contracts with individuals, by which they get out ties for us for a specified price; we advancing the money to pay the expenses of laborers and for the timber and supplies. The demand is so great that we are not able to get the ties as we need them, and we are driven to the necessity of sending laborers into the forest and getting them out directly under our own supervision. We have vast numbers of people in the woods getting out ties, bridge timbers, and other material for our account."

W. R. J. Stratford, the chemical engineer and general superintendent of the company, testified as follows:

He was what might be called the chemical engineer and general superintendent of the plant; had been employed about nine years. That he superintended the construction of the plant for the Shreveport Creosoting Company, Limited. That contracts were let on the 8th of May, 1906. That he had been pushing the construction of the plant as rapidly as he could get material. He placed the orders with the manufacturers, and, while they have caused a good deal of delay, yet it is a large plant, and requires a vast quantity of machinery to complete its construction, and, all things considered, he believed they had made fair progress with the work. Explaining to the court the process by which this creosoting was accomplished, he said:

"We first put the timbers into proper shape, as stated by our Mr. Signor, and then we load the material on iron cars, and run the loaded cars into large retorts. These are then closed, and the wood subjected to severe pressure. When the sap has been steamed out of the wood, the steam is released, and a vacuum raised in the retort in order to dry the timber and to open its pores. With this vacuum still on the timber, the retort is filled with creosote. Then the pressure is applied and maintained by pumps until the proper amount of creosote is driven into the timber. When this is accomplished, the retort is drained. It is then opened, and the material removed ready for shipment and use. Creosote is an organic mixture composed of several varying oils that come between carbolic acid and pitch in the distillation of coal tar. When soft woods like sap pine are treated to this chemical and mechanical process, they assume an entirely quality or combination, and not only have a longer life added to them, but they have a new quality, in that the treated tie will hold spike with greater tenacity, thus adding to its value in a roadbed.

"A creosoting plant ordinarily does not undertake to treat anything but the soft wood, such as sap pine, pole gum, etc. This character of timber is of little or no value for cross-ties, telephone, or telegraph poles in its natural state, but when it has undergone treatment it is considered of great value. The telephone or telegraph pole when creosoted, will last longer than the choicest white cedar, and it is known that the ordinary sap tie will last until it wears out. It will not rot if thoroughly creosoted. We have something like $150,000 invested when we get our plant completed. There are some parts of the machinery ordered not yet completed by the manufacturers. We have one additional cylinder retort to be supplied. Besides the laborers employed in the woods getting out timbers, we have a great number of skilled and unskilled laborers who work at the plant. I would say that, when we are in full operation, we would utilize from 200 to 400 men. We have probably now employed 50 or 60 people.

"All the property that we own is used exclusively for this plant. We have office room on the ground, which is absolutely necessary, and there is a residence on it which is known as the Smith tract, which the company permits me to occupy, as it is necessary that the superintendent, or his assistant, should be at the plant all the time. It is operated day and night."

The charter of the plaintiff company is not in the record. The lands on which its buildings and machinery are constructed was purchased after the 1st of May, 1906. The state taxes have been paid upon it. The assessment on the property had been closed at the time of plaintiff's purchase. The machinery was put into operation for the first time on December 27, 1906, when a lot of cross-ties

which the company had bought from the Signor Burton Tie Company was subjected to treatment under the process which plaintiffs claim constitutes it a manufacturer of wood under article 230 of the Constitution of 1898 and exempted it by reason of that fact from parochial and municipal taxation for that year. The assessment which was made for the year 1906 is not in the record. We have no reason to suppose that, after the buildings and machinery were placed where they were, they were assessed substantively and independently of the land on which they were situated; nor that the assessment of that land had been increased by reason of the improvements placed upon it.

As matters stand, the claim for exemption presented by the company rests upon the proposition that the timber land purchased by it in May or June had itself become exempted from parochial and municipal taxation for the year 1906; that this exemption arose because of the intended future employment by the corporation of the timber growing upon it in the manufacture of articles of wood. There are several reasons for rejecting that claim. Under article 230 of the Constitution, the things exempted are the capital, machinery, and other property "employed in the manufacture of furniture and other articles of wood." The thing exempted is not land owned by the corporation upon which trees are standing in the roots, which, after being cut down, could be made use of for the manufacture of articles of wood. The thing exempted must be itself employed directly in the manufacture. It does not suffice simply that it be the source from which articles could be supplied which might themselves be so utilized. In the case at bar it is immaterial what the intention of the corporation might be in respect to the trees, if the property is in point of fact not so employed by the corporation in the manufacture of articles of wood. The articles which the corporation has used at its creosoting plant

were cross-ties already existing in kind as articles of wood, which a treatment improved and made more valuable than they had been when purchased, through a creosoting process employed by the plaintiff. The process was not "creative" in character, but merely preservative. Its effect was not to change the things subjected to the process to something else, but to make them command in the hands of its owners a higher price. We do not think that plaintiff's process brings about any chemical change in either the creosote employed, or in the wood into which it is injected, which would authorize exemption any more than a kiln-drying process would justify an exemption from taxation.

We think that plaintiff's counsel correctly referred to the process as a treatment of the things subjected to it. If those articles were altered in the hands of the plaintiff as to form or appearance, it was dehors the process, and not by means of the machinery employed. Counsel, in opposition to the claim for exemption, say:

"In the instant case, the manufacture of cross-ties, etc., as such, is carried on, not at the plant, but out in the woods, and is done mostly by separate companies, such as the Signor Burton Tie Company, or persons who do the work under contract with the creosote company. Not one ounce of solid matter is added to or taken from the tie at the plant. It is hewn from the native tree into the proper length, width, thickness, and shape in the forest, and not any of the plant's machinery, land, and workmen are employed for this purpose. When the tie reaches the plant, tar and other substances which are formed into a concoction are pressed into it to the distance of one or two inches for the purpose of preserving it. All of the so-called manufacturing done by the plant is expressed in the foregoing paragraph. The query then is:

"Does such a process constitute the manufacturing of articles of wood? Is it not the preservation of articles of wood already manufactured? It seems to us that, under the legal and ordinary commonly accepted idea of what constitutes a manufactured article, such a process does not constitute the manufacturing of articles of wood.

"It is true that the creosote is a mixed liquid, and that the tie is manufactured; but the latter is not manufactured by or at the plant, and the former, wherever it may be mixed, is not exempt from taxation.

"Hence, would an unexempted liquid pressed

into a finished article of wood which was bought of the true manufacturer of the same, and who was entitled to exemption, create a new article of wood subject to further exemption? If the court feels the least doubt about the matter, then, as shown by decisions quoted in the beginning of this brief, it should decide in favor of the taxing power. * * *

"The purpose for which the tie or telegraph pile is to be used is not changed. Their purposes, dimensions, shapes, sizes, etc., are fixed and determined before they ever come upon the premises of the creosote plant, and before the plant's machinery is applied to them. Should rough lumber be bought by a plant, and it be changed or converted by labor, machinery, and capital into different shape for domestic or other immediate use, such as furniture, counters, cabinets, etc., whether these same articles were hard oiled, varnished, polished, creosoted, or not, the plant would be exempt from taxation, and the painting, hard oiling, varnishing, or creosoting of same would be only incidental to the creation or manufacture of the real article of wood. And it seems to us that if the machinery to the carrying on of this incidental work be not connected directly with the factory which turns out the article of wood, if it did not constitute a part of same and be under the same management and ownership, this incidental machinery would not be exempt from taxation. The telegraph pole, as it lies on the car, before it is switched into the creosote premises, is cut and shaped to be used as a telegraph pole, and is an article of wood manufactured for said purposes, and none of the plant's machinery has yet been applied to it. When it emerges from the creosote cylinder, it is still an article of wood with the same shape, length, dimensions, etc., and destined to be used for the same purpose. Now, has this cylinder and creosote manufactured an article of wood? It has caused it to be better preserved, but it has manufactured nothing. Painting with ordinary paint would give it a life longer than its natural life; coating it with coal tar would give it a longer life than painting it; and creosoting is claimed to give it a longer life than the coating of it with coal tar would give it. Do all these processes, if some machinery be used, constitute a manufacturer of articles of wood, which are already otherwise in a finished state? If they do, the city and state have no case; but on the other hand, if one of these processes does not come under the exemption article of the Constitution, the others do not, because the only difference between the processes is a difference in degree."

The industry in which plaintiff is engaged is unquestionably one of great importance and worthy of encouragement, but its reward will have to be found in the demand for the articles made at high prices.

We do not find in the record any ground for the exemption contended for by the plaintiff. We must limit our decree to the present condition of things. We should not and cannot render a decree to cover by anticipation an exemption for the future. Assuming that an exemption for this year could be legally demanded, it would not follow that exemption would extend to conditions in the future. Whatever the future may develop, the plaintiff is not entitled to exemption as presently claimed.

Adopting what was said in Atlas Feed Company v. City of New Orleans, 113 La. 618, 37 South. 531, we also say that it will be time enough to raise the question of the exemption of particular machinery as employed in the manufacturing of articles of wood, when some portion of the product whose manufacture has given rise to the claim for the exemption has been brought by that machinery into existence.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, annulled, avoided, and reversed; that the injunction which issued herein be dissolved; and plaintiff's demand be dismissed without prejudice.