THE PEOPLE ex rel. THE BRUSH ELECTRIC MANUFACTURING COMPANY, Appellant, *v.* EDWARD WEMPLE, Comptroller, Respondent.

The relator, a domestic corporation, organized under the General Manufacturing Act (Chap. 40, Laws of 1848), is engaged in the business of producing electricity and supplying the same to customers for lighting purposes. In proceedings to review by certiorari a decision of the comptroller holding the relator liable to pay taxes and penalties imposed by the act of 1880, providing for the assessment and payment of taxes by certain corporations (Chap. 542, Laws of 1880), and the act of 1881, amending the same (Chap. 361, Laws of 1881), *held*, that it was a manufacturing corporation within the meaning of the provision of said act exempting such corporations, and so was exempt from taxation until the passage of the amendatory act of 1889 (Chap. 353, Laws of 1889), which took electric light companies out of the exemption clause.

The decision was made by the comptroller upon application of the relator, under the amendatory act of 1889 (Chap. 463, Laws of 1889), which authorizes the comptroller to revise and readjust any account for taxes settled by any corporation. The account against the relator was settled by the comptroller July 3, 1889, immediate notice of the assessment was given to it, and, after the expiration of thirty days, no proceedings having been taken to review the same, as provided by said act of 1881 (§ 17), as amended in 1885 (Chap. 501, Laws of 1885), the comptroller issued his warrant for the collection of the tax. It was claimed on behalf of the defendant that the relator had, by the delay, lost his right of review by certiorari. *Held*, untenable.

The relator, up to the time the tax was so settled and adjusted in 1889, had made no reports and paid no taxes. It was claimed by defendant that the relator had another remedy, that is, by appeal from the determination of the comptroller to a board constituted for that purpose by the act of 1881 (§ 1), and so that under the provision of the Code of Civil Procedure (§ 2122), which provides that, except when otherwise prescribed by statute, a writ of certiorari may not be issued to review any determination which can be adequately reviewed upon appeal, to any body or officer. *Held*, untenable; that the said provision for appeal did not apply to a case where the corporation claiming it was not subject to any tax whatever, and had made no report, but simply to cases where reports having been made, the comptroller, not satisfied therewith, has proceeded to make a valuation of his own, and settled an account against the corporation on that valuation; that the valuation and determination in question was made, not under the section of said act containing said provision for appeal, but under a section (§ 12) added by the amendatory act of 1882 (Chap. 151, Laws of 1882), as amended in 1885 (Chap. 501, Laws of 1885); and so that, as by the act of 1889, under which the application was made (§ 20), express provision is made for review by certiorari of the action of the comptroller, the relator was entititled to the writ.

(Argued December 14, 1891; decided January 20, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made September 8, 1891, which modified, and affirmed as modified, a decision of the comptroller of the state, denying a petition of the relator for a revision and readjustment of accounts for taxes against it, imposed under the act of 1880 (Chap. 542, Laws of 1880), and the acts amendatory thereof.

The facts, so far as material, are stated in the opinion.

*John W. Houston* for appellant.   The relator had exhausted the remedy given it by the act under which the tax was levied, and was, therefore, entitled to the writ.   (Laws of 1889, chap. 463; Laws of 1880, chap. 542; Laws of 1881, chap. 361.) The operations of companies engaged in the business of the relator are essentially manufacturing operations, the result is a manufacture, and consequently the relator is a manufacturing corporation within the meaning of the statute exempting such corporations from the payment of a tax to the state.   (*N. G. L. Co.* v. *Brooklyn*, 89 N. Y. 409; *People* v. *K. I. Co.*, 99 id. 181; *E. U. M. Co.* v. *F. E. L. & P. Co.*, 82 Me. 464; 150 Mass. 392; *Emerson* v. *Commonwealth*, 108 Penn. St. 111.)   The legislature itself has in various statutes applied the word "manufacturing" to companies engaged in the business of electric lighting, and has thereby indicated the meaning which it attached to the word as used in chapter 542 of the Laws of 1880.   (Laws of 1882, chap. 73, § 1; Laws of 1887, chap. 716; Laws of 1890, chap. 506, § 6.)   The legislature has shown its construction of the act of 1880 by deeming it necessary in 1889, in order to enable the state to impose a state tax upon electric light companies, to amend the act of 1880 by expressly declaring that such companies should not be exempt.   (Laws of 1880, chap. 542; Laws of 1881, chap. 361; *N. G. L. Co.* v. *City of Brooklyn*, 89 N. Y. 409; *People* v. *Bd. Suprs.*, 16 id. 424; *People* v. *N. Y. F. D. D. Co.*, 92 id. 187.)   The executive officers of the government have themselves construed the word "manufacturing" to include electric lighting companies.   This construction is entitled to great weight.   (*U. S.* v. *Moore*, 95 U. S. 763; Sedg. on Dam. 216; *People ex rel.* v. *Beach*, 19 Hun, 259.)

*Charles F. Tabor, Attorney-General,* for respondent.   The relator was not entitled to the writ of certiorari granted herein by the court.   (Laws of 1889, chap. 463; *Gilmore* v. *City of Utica*, 121 N. Y. 569; *People* v. *Conner*, 46 Barb. 333; *People ex rel.* v. *Town Clerk*, 29 Hun, 216.)   So far as any question concerning the validity of the tax sought to be

reviewed herein is made to depend upon the petition and return of the comptroller, it must be held that the return is conclusive as to the facts embraced within it. (*People* v. *Dains*, 38 Hun, 43; *People* v. *Fire Commissioner*, 73 N. Y. 437; *People* v. *City of Rochester*, 21 Barb. 656; *People* v. *Knowles*, 47 N. Y. 415; *People* v. *Van Alstyne*, 32 Barb. 132; *People* v. *Wheeler*, 21 N. Y. 82; *People* v. *Goodwin*, 5 id. 568; *People* v. *Comrs.*, 106 id. 67; Code Civ. Pro. § 2140; *People* v. *Davenport*, 91 N. Y. 574; *People* v. *Keator*, 36 Hun, 594; *People* v. *Williams*, Id. 366; *People, etc.*, v. *Comrs. of Taxes*, 21 N. Y. S. R. 358; *People, etc.*, v. *Comrs. of Taxes*, 104 N. Y. 240.) The acts of 1880 and 1881 are general statutes, imposing a tax upon corporate franchises; and if the relator claims exemption from their operation, the burden is upon it to clearly and satisfactorily establish its exemption. (*People* v. *Commissioners*, 76 N. Y. 64; Burroughs on Taxation, 132, § 70; *Delaware Railroad Tax*, 18 Wall. 206; *North Missouri Railroad* v. *McGuire*, 20 id. 46; *Erie Railway Co.* v. *Pennsylvania*, 21 id. 492.) Even if the relator is to be regarded as a corporation engaged in the business of lighting the streets, avenues and public places, and public and private buildings in the city of New York with electricity, still, it is undoubtedly a corporation liable to taxation under the act of 1881. It is not a manufacturing corporation in the sense in which that term is used in the act of 1881. (*N. G. L. Co.* v. *City of Brooklyn*, 89 N. Y. 409; *People* v. *K. I. Co.*, 99 id. 181; *People* v. *N. Y. D. D. Co.*, 92 id. 487; *Byers* v. *F. C. Co.*, 106 Mass. 131; *Dudley* v. *J. P. A. Co.*, 100 id. 183; *Frasee* v. *Moffit*, 20 Blatchf. 267.) It cannot be successfully urged that electric light companies have any vested or inherent right to exemption from taxation unless that exemption has been clearly given to it by the legislature. And if it be admitted that there was a question of doubt in 1889 whether, under all the circumstances stated, they were or were not intended to be included in the exemption of a general class of corporations, then it must also be admitted that the legislature had the right to, and, we believe,

did solve that doubt in the act of 1889 by declaring that they were not so included, and the comptroller was right and justified in following this legislative declaration in the assessment made herein. (Laws of 1879, chap. 512; Laws of 1880, chap. 542; *N. G. L. Co.* v. *City of Brooklyn*, 25 Hun, 567; 89 N. Y. 409; Laws of 1881, chap. 361; Laws of 1889, chap. 533; Laws of 1882, chap. 73; *Vicksburgh* v. *Dennis*, 116 U. S. 665; *C. R. R. Co.* v. *Guffey*, 120 id. 575; *Y. R. R. Co.* v. *Thomas*, 132 id. 185.)

O'Brien, J.   This appeal brings here for review, a judgment entered upon the return to a writ of certiorari, sued out by the relator, for the purpose of reviewing a decision or determination of the defendant as comptroller of the state, whereby the relator was adjudged liable to pay certain taxes and penalties to the state under chaper 361 of the Laws of 1881, and the laws supplementary thereto and amendatory thereof, providing for the assessment and payment of taxes to the state by certain corporations.  The relator is a domestic corporation, organized by filing a certificate February 17, 1881, under the act of 1848, providing for the formation of corporations for manufacturing and other purposes.   Since its organization it has been engaged in the business of producing electricity and supplying the same to its customers in the city of New York for the purpose of lighting public and private places.   The relator contended that it was a manufacturing corporation, and as such exempt from paying the tax to the state upon its business, and made no reports and paid no tax till July, 1889, and then only by force of chapter 353 of the Laws of 1889, which took electric light companies, by name, out of the exemption clause in favor of manufacturing corporations.   The relator is, beyond all controversy, liable for the tax since the passage of the act last mentioned, but denies that it is liable for anything before, as the exemption clause covering manufacturing corporations then applied to it.   In the year 1889 the comptroller caused an examination of the affairs of the relator to be made by a commissioner

appointed by him, and upon his report made a statement of the account between the relator and the state, and determined the amount of the tax and penalty due to the state at $10,752.50. The comptroller then issued his warrant to the sheriff, under the statute, directing the collection of the tax out of the relator's property, and it was thus compelled to pay in order to protect its property from sale, and it did pay under protest. By chapter 463 of the Laws of 1889, power is given to the comptroller at any time to revise and readjust any account for taxes settled against any corporation by him or any of his predecessors in office, for taxes arising under the statute, when it is made to appear by evidence submitted to him that the same has been illegally paid, or when it includes taxes that could not have been lawfully demanded, and he was required to resettle the account according to law and the facts, and to charge or credit, as the case might be, the difference, if any, resulting from such revision and resettlement, upon the current account of such coporation. The relator, claiming the benefits of this statute, filed with the comptroller, August 4, 1890, an application in writing in the form of a petition for a revision and readjustment of the taxes previously levied and paid. This application was verified and accompanied by proofs to show that the relator was a manufacturing corporation, and for that reason the taxes paid by it could not have been lawfully demanded by the state. The comptroller denied this application, and from his order, refusing the revision asked for, the relator sought relief in the courts by means of the writ of certiorari. The relator did not complain of the amount determined by the comptroller, and the only question which was the subject of controversy on the application for a revision was whether the relator was or was not exempt from payment of taxes as a manufacturing corporation. A question of practice is presented by a point made by the attorney-general to the effect that the relator was not entitled to the writ of certiorari in this case, which renders it necessary to notice the various statutory provisions prescribing the methods of reviewing the determination of the comptroller in these cases. The

account against the relator which established the assessment, so far as it was within the power of the comptroller to do so, was settled July 3, 1889.  Immediate notice of the assessment was given to the relator, and after the expiration of thirty days, no proceedings having been taken to review the same, under section 17 of the act of 1881, as amended by chapter 501 of the Laws of 1885, the comptroller issued his warrant for the collection of the tax.  The learned attorney-general contends that the relator, by delay, lost the right of review by certiorari. This would probably be so, except for subsequent legislation, which must be presently noticed.  The Code (§ 2122) provides that, except as otherwise prescribed by statute, a writ of certiorari cannot be issued to review any determination which can be adequately reviewed by an appeal to a court, or to some other body or officer, and it is argued by the attorney-general that the relator could have appealed from the determination of the comptroller to a board composed of the secretary of state, attorney-general and state treasurer, under the last clause of section 1 of the act of 1881, and for that reason was not entitled to the writ.  The provision for an appeal to this board does not seem to apply to a case like this, where the officers of the corporation, taking the position that the company was not subject to any taxation whatever under the act, neglect or refuse to make any report, but to cases where reports are made by the proper officers of the corporation, and the comptroller, not being satisfied with such report, proceeds to make a valuation of his own, and to settle an account against the company upon the basis of such valuation, then the company may appeal to the board above mentioned, and the question presented by the appeal would seem to be whether the valuation made by the corporate officers, or by the comptroller in disregard of it, is the correct and just one.  Here the valuation and determination was not made under section 1, but under section 12 of the act of 1881, as amended by chapter 151 of the Laws of 1882, and chapter 501 of the Laws of 1885.  But the act of 1889, above referred to, which gives to the relator the right to apply for a revision and resettlement of the tax, also prescribes a

method for reviewing the action of the comptroller upon such application, which brings up all questions involved in the application. That provides that "The action of the comptroller upon any application made to him by any person or corporation for a revision and resettlement of accounts, as provided in this act, may be reviewed, both upon the law and the facts, upon certiorari by the Supreme Court at the instance either of the party making such application, or of the attorney-general, in the name and in behalf of the people of the state,. and for that purpose the comptroller shall return to such certiorari the accounts and all the evidence submitted to him on such application, and if the original or resettled accounts shall be found erroneous or illegal by that court, either in point of law or of fact, the said accounts shall be then corrected and restated by the said Supreme Court, and from any such determination of the Supreme Court an appeal may be taken by either party to the Court of Appeals, as in other cases." Whatever may be said against the policy of requiring the comptroller to revise and change accounts for taxes years after the settlement of such accounts, and perhaps after the payment of the tax, this statute is broad enough in its language and was, we think, intended to reach such a case as this. The right of the state to receive the tax assessed upon the relator depends upon the question whether it was or was not a manufacturing corporation. In the original act, providing for the payment of taxes to the state by certain corporations, "manufacturing corporations carrying on manufactures within this state" were exempted from its operation. (Laws of 1880, ch. 542, § 3.)

In the practical operation of the law it was soon discovered that these broad general words of exemption covered and protected from the payment of the tax a class of corporations which the legislature probably did not intend to relieve when inserting the words of exemption in the statute. Accordingly it was found necessary from time to time, as the cases arose, to take out of the general exemption certain corporations by name which the legislature thought was not within its

policy.   The courts held that gas companies were manufactur-
ing companies (*Nassau Gas Light Co. v. City of Brooklyn*,
89 N. Y. 409), and the legislature, in 1881, proceeded to
amend the law by providing that gas companies should not be
taken to be within the exemption.   So electric lighting and
power companies were taken out of the exemption by the use
of similar language.   (Laws of 1889, chap. 353.)   These
amendments, it is contended in behalf of the relator, show a
construction by the legislature of the term "manufacturing
corporations," in harmony with its claims in this case.   In so
far as the action of the legislature has any bearing on the
question at all, it is, no doubt, in that direction.   But the cir-
cumstances under which the amendment of 1889 was made
deprives it of much of the weight that courts are accustomed
to give to what is known as legislative construction.   A con-
troversy then existed, as it had existed for some time before,
between the state on the one hand and the companies on the
other.   The companies claimed that they were exempt, as
manufacturing companies, from liability to pay taxes to the
state under the act, while the comptroller, representing the
state, asserted the contrary.   In this condition of things the
legislature stepped in and enacted that thereafter the com-
panies should not be deemed within the exemption clause, and
this settled the controversy so far as the future was concerned,
but, as to the years that had elapsed when no report was made
or any taxes paid, the question was left substantially where it
was before.   When a material change in phraseology is made
many years after the passage of the act, and after controver-
sies and differences in regard to its construction have arisen,
there is sometimes a presumption that the legislature intended
by the amendment to add a new provision to the original act,
and to make it apply to a case to which it did not apply before.
When the legislature takes certain property for the purposes
of taxation, out of an exemption clause by name, the question
arises whether there is not a presumption in such a case that
it was within it before.   (*People v. Board of Supervisors*,
16 N. Y. 431; *People v. Knickerbocker Ice Co.*, 99 id. 184.)

As the statute now reads certain manufacturing companies are by name taken out of the exemption and subjected to the payment of the tax. Whether without this special exception they would still be exempt, under the general words of the exemption clause, is substantially the question involved here. Electric light and power companies are not now manufacturing companies within the statute under consideration, because the legislature, in 1889, so enacted. But it does not follow that because the legislature then declared that they should not be deemed manufacturing corporations and thus not exempt from payment of the tax, that they were not such, and so exempt before. In determining whether a given case is within a clause in a statute exempting certain property or interests from taxation, the policy of the law in making the exemption must be considered and should have great weight. If the question whether a corporation engaged in the business of furnishing electricity for lighting public and private places or for power, is a manufacturing company, was made to depend upon the meaning of these words as found in dictionaries, or upon the technical language of science in describing electricity as a power or as an agent in nature, it would doubtless be difficult and perhaps impossible to show that the process which the relator calls manufacturing produces anything that in a certain sense and in some form did not exist before. That, however, is true of most if not all manufacturing operations. The application of labor and skill to materials that exist in a natural state, gives to them a new quality or characteristic and adapts them to new uses, and the process by which this result is brought about is called manufacturing, whether the change is accomplished by manual labor or by means of machinery.

But we think that these considerations are by no means conclusive in determining the true scope and meaning of the terms "manufacturing corporations," as they are used in the statute. The true inquiry would seem to be whether a corporation organized as this is and carrying on the business that this does, and in the manner shown, would not be considered in common language as engaged in some manufacturing process,

or carrying on some manufacturing business, though granting all that is said by experts and others about electricity as a natural element or force.  To say that electricity exists in a state of nature, and that a corporation engaged in the business that the relator is, collects or gathers it, does not fully or accurately express the process by means of which it is enabled to sell and deliver something useful and valuable to its customers.  The business in which the corporation is engaged renders it necessary, in the first place, to invest a large amount of capital in a plant, which may appropriately enough be called a factory.  Then it must purchase and consume a vast amount of coal to produce steam, and to furnish power for the operation of machinery.  Then it supplies and operates a complicated system of machinery such as boilers, engines, dynamos, shafting, belting and such other things as are commonly used in manufacturing establishments, and then by means of wire, cables and lamps it lights streets and private houses by electricity for a compensation.  But the electricity or electric currents that produce this result cannot properly be said to be the free gift of nature, gathered from the air or the clouds. . It is the product of capital and labor and in this respect cannot be distinguished from ordinary manufacturing operations.  According to the common understanding the electricity or thing which produces the results, from which the corporation derives its income, is generated or produced by the application of power to machinery and thus, by means of a process wholly artificial, the relator is enabled to sell the product of its operations to its customers.  Passing by the refinements of scientific discussion as to the nature of electricity, it would seem to be common sense to hold that a corporation that does all this is, in every just sense of the term, a manufacturing corporation.  The mere appropriation or use of an article or thing which is furnished by nature is not a manufacturing operation.  The liberation of natural gas from its hiding place in the earth, and its transportation through pipes to consumers, would not properly be called a manufacturing operation, but

the production of illuminating gas and its distribution to customers, by means similar to the operations which the relator carries on, has been held by this court to constitute manufacturing, and a corporation organized for that purpose is a manufacturing corporation. (*Nassau Gas Light Co.* v. *City of Brooklyn, supra.*)

So, too, we have held that the collection, storage, preparation for market and transportation of ice is not a manufacture, but the production of ice by artificial means is. (*People* v. *Knickerbocker Ice Co.*, 99 N. Y. 181.)

When we attempt to establish the proposition that the gas which lights one room is a manufactured product, and the electricity which lights another is not, we are obliged to rely more upon the definition of terms and the distinctions of scientists than the actual practical processes and operations by means of which results, in all respects or at least substantially the same, are produced. If due weight is given to the fact that electricity, as now used and applied to the business of life, such as the lighting of streets and buildings, the propulsion of cars and machinery and like operations, is essentially the product of the skill and labor of man, there is no difficulty in reaching the conclusion that a corporation engaged in the business of generating, storing, transmitting and selling it is, what was commonly known at the time of the passage of the corporation tax law in 1880, a manufacturing corporation. The learned judge who gave the opinion in one of those cases at the General Term has extracted from the proofs before the comptroller, on the application of the relator, a concise and accurate description of the mechanical process used in the business of electrical illumination, which, on account of its clearness and brevity, conveys the idea better than any language we could employ :

" A steam engine is used as a motive power for the propulsion of machinery, which is attached to a driving wheel, which, by means of a belt connected with another wheel or pulley of the dynamo, turns or revolves the armature. The armature is a coil of wire wound on a metal core and mounted on a shaft,

and is revolved by the power communicated from the engine through the means of the belt. The armature is revolved within or between the ends of a large horseshoe magnet, the opening of which is downward. The magnet is made by winding a soft iron horseshoe, or soft curved horseshoe shaped iron with a coil of conducting wire, and sending through the coil a current of electricity. When once vitalized by such current, the magnet never loses this magnetic property, even after the current stops, but is ever afterwards available for the purpose of electric currents, upon the armature being revolved between the poles of this magnet. By the rapid revolution of the armature within what is termed the field of force between the poles of the magnet, this mysterious force or energy is accumulated, known as electricity, and is thence conducted over copper bars or mains throughout the territory or city in which it is used, and is distributed on smaller wires or mains to the houses or places which are to be lighted."

The materials from which all manufactured things originate exist in a natural state; but the manufacturer, by the application to these materials of labor and skill, gives to them a new and useful property. The electricity which is generated and transmitted by the operations of the relator and which, under its manipulations, illuminates houses and streets, is a very different thing from that mysterious element that is said to pervade nature. The attorney-general has attached to his brief in this case a very elaborate and able opinion by the Court of Common Pleas in Pennsylvania, in the case of *Commonwealth of Pennsylvania* v. *U. S. Electric Lighting Company*, in which the learned judge arrives at the conclusion that companies of this kind are not manufacturing corporations. It is proper to say, however, that the highest court of that state, while affirming the judgment rendered by the learned judge on other grounds, did not assent to his views that electric light companies are not manufacturing corporations. (*Commonwealth of Pennsylvania* v. *Northern Electric Light and Power Company.*) The case is not yet reported, but the following passage from the opinion of the court by Williams, J.,

expresses views upon this question which are applicable to the case at bar:

"This company, whose character we are considering, sells the electricity it makes, or 'brings into being,' as a commodity. It provides the lamps or appliances for the use of its customers by means of which the light is produced. It sells them the electricity, measures it as it is delivered and is paid for according to the quantity furnished. Whatever electricity may be, it seems absolutely within the power and under the control of the company that brings it into being. It is compelled, by the process employed, to come into being. It is secured, stored, poured out or liberated at will. Its manifestations are both seen and felt. It moves with incredible velocity and power. It carries the tones and inflections of the human voice, or moves loaded cars, depending on the volume of the current and the manner of its application. It may be, in the hands of a physician, a soothing remedial agent, and in the hands of the law, an instrument of execution, swifter and surer than the headsman's axe. It may be too early to show just what it is. The scientists, whose views the learned judge adopted, may be right or wrong. We have no need to decide that question. The laws are written, ordinarily, in the language of the people, and not in that of science; and if this case depended on the question on which it turned in the court below, we should be led by the findings of fact to a different conclusion from that which was there reached, and hold that this company was a manufacturing company."

The facts that are before us in this case, touching the manner of generating and using electricity, are the same in substance as were before the Supreme Court of Pennsylvania in the case above referred to. One of the experts, whose testimony was submitted to the comptroller by the relator on the application to revise and resettle the tax, thus described the process:

"The electrical energy, which is manufactured and sold by electric lighting corporations, originally resides in, and is extracted from, the coal which is burned, or, more correctly

speaking, from the heat which is produced by the combustion of coal. Electrical energy is produced at the central station; it may be stored up in cells of definite capacity known as accumulators; it may be, and in fact is, measured and sold in determinate quantities at a fixed price precisely as are coal, kerosene oil and gas. It may be conveyed to the premises of the consumer upon a wagon, boxed up in an accumulator, or it may be sent through a wire, just as gas or oil may be transported either in a closed tank or forced through a pipe. Having reached the premises of the consumer, it may be used in any way he may desire, being, like illuminating gas, capable of being transformed either into heat, light or power at the option of the purchaser."

The legislature has, in various acts passed since the corporation tax law was enacted, described the process of generating electricity as a manufacturing process, and recently in a revision of the statutes providing for the incorporation of such companies, they are described as corporations for "manufacturing and using electricity." (Laws 1890, ch. 566, art 6, § 60; Laws of 1882, ch. 73, § 1; Laws 1887, ch. 716.)

This is also true with respect to the statutes passed for the incorporation and regulation of such companies in England and in many of our sister states. (45 and 46 Vict. ch. 56; R. S. Ohio, 1890, § 8752.) We think that, until the amendment of 1889, the relator was exempt from payment of taxes to the state under the exception in the statute in favor of "manufacturing companies" generally. The judgment of the General Term and determination of the comptroller should be reversed, and the comptroller directed to resettle the account, and to credit the relator in its account the amount of the tax and penalties paid, with interest from the date of payment, and costs in all courts to the relator.

All concur.

Judgment accordingly.