# STATE BOARD OF EQUALIZATION v. STANOLIND OIL & GAS COMPANY

(No. 2116; September 27, 1939; 94 Pac. (2d) 147)

522

The cause was submitted for the plaintiff in error on the brief of *Ray E. Lee*, Attorney General; *Thomas F. Shea*, Deputy Attorney General; and *Wm. C. Snow*, Assistant Attorney General, all of Cheyenne.

524

For the defendant in error, the cause was submitted upon the brief of *Hagens & Wehrli* of Casper.

*Erle H. Reid* of Torrington and *John C. Pickett* of Cheyenne joined in a brief as amici curiae.

RINER, Chief Justice.

This proceeding in error was brought by the State Board of Equalization of the State of Wyoming, hereinafter generally designated as the "Board," or "plaintiff in error," to review a judgment of the district court of Laramie County in favor of the Stanolind Oil and Gas Company, a Delaware Corporation, authorized to transact business in this State by virtue of its laws relative to foreign corporations, subsequently herein referred to as the "Company," or the "defendant in error." The questions presented and requiring disposition arise under the so-called "Selective Sales Tax Act of 1937," Chapter 102, Laws of Wyoming, enacted that year.

The Company, in the regular course of its business, heretofore reported certain of its transactions to the Board, and the latter, as the State Agency charged with the administration of the Act aforesaid, imposed a tax under said Act in connection with some seventeen (17) stated items or transactions. From this action of the Board, the Company, as it was authorized to do, (Chapter 102, Section 13, Laws of Wyoming, 1937,) appealed to the District Court of Laramie County. An amended petition was filed herein on behalf of the Company, the Board filed its answer thereto in the form of a general denial, and the cause was tried de novo, as the law (Section 13, supra) directs. There

was an agreed, or stipulated, statement of the facts concerning each of said items or transactions submitted to the trial court by the parties. The district court, as indicated above, reversed the Board's action in the premises and annulled its imposition upon the Company of the taxes upon the several transactions laid, as aforesaid. From its judgment in so doing, the cause was removed to this Court for review of the record in the matter. The pertinent, agreed facts as to each item, or transaction, in question, and the contentions of the parties thereon will be mentioned in connection therewith.

The cause was submitted to this Court without oral argument and upon briefs of counsel. By appropriate court order, briefs of amici curiae were allowed to be filed herein, and have been considered and material aid supplied the Court thereby in the disposition of the cause.

It may be stated at the outset of our discussion that transactions which present somewhat similar questions under the law and facts involved will, as far as possible, be considered together. It may be observed also that, of the seventeen (17) transactions subjected to taxation by the Board, the first and fifteenth thereof listed in the Company's amended petition filed in the district court need not at this time be reviewed, the first because it is now conceded by the parties that, as to it, the tax was erroneously imposed, and the fifteenth because the matters involved therein have been already settled satisfactorily to the parties hereto.

Items, or transactions, Nos. 2, 3, 4, and 13 are described in the Company's amended pleading, and the ruling of the Board, as:

"2. Electric power used by Stanolind in the performance of its contract with the producing companies for the operation of producing properties is subject to the sales tax."

"3. Electric power furnished by The Stanolind Oil and Gas Company to the producing companies under the operating contracts mentioned in the previous item for the operation of field camps of the producing companies is subject to the sales tax."

"4. Trucking and automobile service (company cars) for lease operation and the operation of Stanolind's facilities in the Salt Creek Field is subject to the sales tax."

"13. Contribution to expense and up-keep of private telephone line is subject to the sales tax."

The controlling agreed facts as to these transactions are substantially as follows concerning Item No. 2:

That during the month of April, 1937, the Company was engaged in the performance of certain contracts which it had made "long prior thereto" with corporations owning either the fee title or certain oil and gas leases thereon in the Salt Creek Oil Field in Natrona County, Wyoming. By these contracts it was required that the Company should pump and produce oil for said owners and should furnish all labor and facilities necessary therefor; that as its compensation for doing this these contracts provided that the Company should receive "its cost incurred therefor," which should be computed on the basis of "certain schedules and formulae" described in said contracts; that the Company used its own employees in such performance; that the Company owns and, through its own employees, operates an electric plant, from which for the month of April, 1937, it furnished to itself and through its own employees utilized electric power for its contract operations aforesaid and "set up" on its books certain charges therefor against the said owners of the several properties; that during all this time it did not offer to furnish, or furnish, electricity to or for the public, nor did it furnish same to others except under private contracts; that the Company never has filed, published or posted any rates at which it would undertake to supply electric service within the area of its operations, never

held itself out as furnishing such service nor solicited customers therefor; that it has never subjected its electric plant to the control and supervision of the Public Service Commission of the State of Wyoming, nor has the latter ever demanded or required that as a Public Utility it should do so.

Concerning Item No. 3: That during the month of April, 1937, the Company, under said operating contracts, supplied electric power to itself, utilized by its employees for the operation of field camps in said oil field, and made charges on its books against the owners aforesaid therefor. The other agreed facts as to this item are practically the same as those appearing above as to Item No. 2.

Concerning Item No. 4: That the Company owns and operates a number of automobiles, trucks, cleanout units, and other motor equipment, which are used in connection with its carrying out the terms of the contracts aforesaid, partly on the properties involved and partly on the highways of this State; that under said contracts the Company is required to be paid by the owners of the properties aforesaid for the use of such motors and equipment on the basis of the amount of money actually expended by the Company, plus depreciation and other expenses pursuant to formulae contained in said agreements; that insofar as said motor vehicles and equipment are not operated on the State highways, the Company is not a motor carrier as defined by the Commercial Vehicle Act, Chapter 121, Laws of Wyoming, 1937; that, where they are used upon said highways, they are employed as private carriers under said last mentioned Act; that for the month of April, 1937, the Company used these motors and equipment in the operation of said properties, and made certain charges against the owners pursuant to the terms of said contracts.

Concerning Item No. 13: That in addition to fur-

nishing electrical power under said contracts, the Company maintained a private telephone line extending from its executive offices in Casper, Wyoming, to its offices in the Salt Creek Oil Field aforesaid, telephone switchboards and other facilities for their operation, such private telephone system being used by the Company's employees as necessary in order to successfully comply with the terms of the operating contracts aforesaid; that in computing the total cost to the Company of performing its said contracts, a fraction of the cost and expense of maintaining and operating this phone system is charged to the owners of the properties above mentioned on the basis specified in said contracts; that during the month of April, 1937, certain charges were made to said owners of the aforesaid properties pursuant to such arrangement; that as to such telephone service the other agreed facts are in substance the same as those set forth above as to Item No. 2.

Those portions of the Selective Sales Tax Act aforesaid which as material should be kept in mind in connection with the foregoing and other facts presently to be mentioned as involved in the instant litigation, are: Section 2 (b), which reads:

"The term 'sale' or 'sales' includes installment and credit sales, and means any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property, for a consideration, and includes the fabrication of tangible personal property for consumers who furnish either directly or indirectly the materials used in the fabrication work. A transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price shall be deemed a sale, and also includes the sale of electrical energy, gas, services or entertainment, and the rendering, furnishing, or selling for a valuable consideration any of the substances, things and services hereinafter desig-

nated and defined as taxable under the terms of this Act";

Section 2 (d) and (e):

" (d) The term 'wholesale sale' means a sale of tangible personal property by wholesalers to retail merchants, jobbers, dealers or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale";

" (e) The term 'retailer' or 'vendor' means a person doing a retail business, known to the trade and public as such, and selling to the user or consumer and not for resale the things designated as taxable in this Act.";

" 'Retail sale' includes all sales made within the State to a consumer or user, or to any person for any purpose other than for resale, except wholesale sales as herein defined.";

the paragraphs of Section 2 (f), whose language is:

"Each purchase of tangible personal property or product made by a person engaged in the business of manufacturing, compounding for sale, profit or use, any article, substance or commodity which directly enters into and becomes an ingredient or component part of the tangible personal property or product which he manufactures or compounds, or the furnished container, label, or the shipping case thereof, shall be deemed a wholesale sale and shall be exempt from taxation under this Act.

"Each purchase of power and/or fuel or any substitute for the same, made by a person engaged in the business of manufacturing or agriculture and consumed directly in manufacturing or by a person engaged in the transportation business and consumed directly in generating motive power for actual transportation purposes, shall be deemed a wholesale sale and shall be exempt from taxation under this Act.";

and Section 2 (l) entire:

"The term 'tangible personal property' means personal property which may be seen, weighed, measured, felt, touched, or is in any other manner perceptible to the senses.";

also Section 4, wherein this language appears:

"From and after the effective date of this Act, within

the limitation herein set out, there is hereby levied and there shall be collected and paid:

"(a)   An excise tax upon every retail sale of tangible personal property made within the State of Wyoming equivalent to two per cent. (2%), except as provided in subsection (e) of this Act, of the purchase price paid or charged, or in the case of retail sales involving the exchange of property, equivalent to two per cent. (2%) of the consideration paid or charged, including the fair market value of the property exchanged at the time and place of the exchange, except that, those commodities now bearing a State excise tax in excess of five (5) per cent. shall not be taxable under the provisions of this Act.

"(b)   An excise tax equivalent to two per cent. (2%), except as provided in subsection (e) of this Act, of the amount paid: (1) to carriers, or telephone or telegraph corporations defined by the Constitution of the State of Wyoming and also as defined by law, whether such corporations are municipally or privately owned, for all transportation, telephone service, or telegraph service, including the rental or leasing of all equipment or service pertaining or incidental thereto; provided, that said tax shall not apply to interstate movements of freight, passengers and express; (2) to public utilities, gas, electric, and heat corporations as defined by Chapter Ninety-four (94), Wyoming Revised Statutes, 1931, whether such corporations are municipally or privately owned, for gas, electricity, or heat, furnished for domestic, industrial or commercial consumption."

As to these four items above detailed, the contention on behalf of the Board is that under the agreed facts, supra, they were sales of tangible personal property by the Company to the several lease and fee owners and so taxable under the Act. However, counsel for the Board admit in their brief relative to the item numbered "4", as aforesaid, that: "So far as we can see and understand the Act, this item of assessment, if sustained must be by virtue of Section 4 (a) as a sale of tangible personal property, and we are unable to arrive at the conclusion that transportation can be

so defined." This statement would appear to indicate some doubt in counsel's minds as to the propriety of the tax being imposed upon that item, though it is additionally suggested that the Company is a "pipe line company" and authorized to do transportation work of that character only. No pertinent cases are cited in support of this contention and we cannot see that it has any materiality in the instant litigation, where the construction of a tax law is involved.

After a careful examination of the portions of the Act quoted above in the light of the conceded facts and such authorities as we have been able to discover which might throw light upon the matter, we are quite unable to perceive that these four items constitute taxable sales, or in fact sales at all.

The comparatively recent and yet extensive legislation in the field of retail sales taxes has raised an offtimes serious problem whether a transaction is a retail sale or only a service rendered. It would seem that the business done by building contractors generally has been considered to be rendering services rather than selling materials at retail to the owner of the building or the land. Herlihy Mid-Continent Co. v. Nudelman, 367 Ill. 600, 12 N. E. (2d) 638; State v. J. Watts Kearny & Sons, 181 La. 554, 160 So. 77; State v. Christhilf, 170 Md. 586, 185 A. 456; Moore v. Pleasant Hasler Construction Co., 51 Ariz. 40, 76 P. (2d) 225. As to what amounts to a sale at retail within sales tax acts see Notes 99 A. L. R. 837 and 111 A. L. R. 943. In the last cited note the comment is made that "the statutes and the courts seem to endeavor to lay the tax on the last sale before the use or consumption of the goods or articles sold."

A Washington statute provided for a two per centum tax on every retail sale of personal property. A sale, under the statute, was defined somewhat as in our Section 2 (b), supra, as "any transfer of the ownership

of, or title to, property for a valuable consideration." A retail sale was, under the Washington law, defined as "every sale of tangible personal property other than a sale to one who purchases for the purpose of resale in the regular course of business or for the purpose of consuming the property purchased in the producing for sale a new article or substance, of which such property is an ingredient or component or a chemical used in processing same." (Compare our Section 2 (e), supra.) Plaintiff engaged in printing tariff rates from copies furnished by a freight bureau, charged the bureau on the basis of the number of copies printed; only 14 per centum of the price charged the bureau represented paper and ink employed in the printing. Plaintiff was taxed for this printing under the statute, the State claiming that this was a retail sale to the bureau. Action was brought by the plaintiff for a refund of the tax paid under protest. In Washington Printing & Binding Co. v. State, 192 Wash. 448, 73 P. (2d) 1326, the company as such plaintiff was adjudged to prevail, the court holding that this was not a retail sale of tangible retail property but a rendition of service only. In the course of its opinion the court said:

"Before the tax can be imposed it must appear, first, that the seller was the owner of or had title to the property; and, second, that he parted with such ownership or title for a valuable consideration. * * *

"All of the property that respondent had title to was the paper and ink used in printing the tariffs. This small amount of material was practically destroyed by the reproduction of the tariffs, and had no further value to any one other than the bureau. Respondent was not selling its paper and ink to the bureau, but was furnishing its skill and labor and the use of its machinery."

In State v. J. Watts Kearny & Sons, supra, the court said:

"A contractor who buys building material is not one who buys and sells—a trader. He is not a 'dealer,' or

one who habitually and constantly, as a business, deals in and sells any given commodity. He does not sell lime and cement and nails and lumber.

"His undertaking is to deliver to his obligee some work or edifice or structure. The construction of which requires the application of skill and labor to these materials so that, when he finishes his task, the materials purchased are no longer to be distinguished, but something different has been wrought from their use and union. The contractor has not resold but has consumed the materials. Sales to contractors are sales to consumers."

Holding that contractors employed by the Sanitary District of Chicago to construct concrete sewers and tunnels and sewage treatment works were not liable to a sales tax, in Herlihy Mid-Continent Co. v. Nudelman, supra, the court said:

"Under the definition in section 1, only that person transferring the goods 'for use or consumption and not for resale' is subject to the tax. The quantity sold is no test under this definition, Franklin County Coal Co. v. Ames, supra; it is the purpose for which the property is sold that is determinative. Under the contracts before us in this case, plaintiffs agreed to build sewers and buildings requiring the use of sand, gravel, cement, and steel. They were the persons 'using' these materials, even though after their metamorphosis they became part of a structure whose title vested in the Sanitary District of Chicago. While in one sense, title to these materials passed from plaintiffs to the sanitary district, yet the niceties of property law have no place in the construction of a statute of this type. Plaintiffs did not hold themselves out as vendors of the materials furnished, nor did the sanitary district select or purchase the materials used, although it set up certain requirements and specifications in its contract. The identity of the materials used in the construction was destroyed and, as properly found by the lower court, the completed structures had no commercial value as salvage or otherwise. What the Sanitary District of Chicago bought under its contract, if there was a sale at all, were sewers and sewage treatment works completed and ready for use. Under these circum-

stances it would be unreasonable to characterize the transfer of the materials incorporated in the completed structures as a sale."

In Merchants Refrigerating Co. v. Taylor, 275 N. Y. 113, 9 N. E. (2d) 799, it was held that though the company was liable for the New York sales tax on sales of refrigeration service supplied by it through pipe lines, it was not so liable upon its refrigeration service within its warehouse, and the court remarked:

"Appellant has paid to the city of New York the sales tax on sales of refrigeration service made by appellant through pipe lines under its franchise with the city, and also under its annual written contracts with its lessees. The city has imposed the sales tax upon its refrigeration service to customers within its warehouses for the period from December 10, 1934, to August 31, 1935. Appellant insists that as to its warehouse business, it does not sell refrigeration; that it stores goods and in connection therewith it uses refrigeration. In giving substance to this distinction, appellant compares itself to the operators of skating rinks, makers of ice cream, and owners of places air-cooled in summer, and contends that like them it performs a service in connection with which it uses refrigeration. It contends that it no more furnishes a refrigerating service than a turkish bath or a steam laundry furnishes a steam service, or a theater furnishes a refrigerating service in the hot weather. We agree with the appellant that the cooling of its storage rooms for the preservation of merchandise is not a sale of refrigeration or a sale of refrigeration service within the wording or meaning of this Local Law No. 20 (published as No. 21), as amended by Local Law No. 24, 1934 (published as No. 25). The temperature may attract customers and increase the charge, but safe storage is the service sought and paid for."

As we view the matter before us under the law and the conceded facts applicable, the four items described above were simply component parts of the performance of a completed service to be rendered by the Company to the owners of the oil leases and the oil lands

under its contract with them, viz., the production of oil for such owners from their several properties. They were not sales of electric current, telephone use, nor automobile transportation. The owners desired the oil to be extracted from their lands. They did not want, and they were not purchasing, and the Company was not vending to them the separate, component parts of what was necessary to be done in order to perform the completed service for which their contracts were made. That the Company saw fit to itemize and charge under such contracts for the several items in determining the cost to the owners of the service so rendered for them, does not, so far as we can see, alter the situation. It may well be, if the Company instead of itself producing and using its own electric current, had purchased it from a public utility engaged in the business of supplying that facility, that the Company would have been obliged to pay a sales tax therefor.

But if we are mistaken in our interpretation of these matters as outlined above, there is yet another consideration which also leads to the conclusion that these transactions were not taxable. Section 4 of the Act is the one which specifically provides for the imposition of the sales tax. Subdivision (b) thereof declares that the tax shall be collected to the extent of two per cent "of the amount paid * * * (2) to public utilities, gas, electric and heat corporations as defined by Chapter Ninety-four (94), Wyoming Revised Statutes, 1931," and subdivision (b) of Section 2 of the Act announces, as we have seen, that a sale includes "the sale of electrical energy, gas, services or entertainment, and the rendering, furnishing, or selling for a valuable consideration any of the substances, things and services hereinafter designated and defined as taxable under the terms of this Act."

Reading and construing the language of these two sections together, as must be done, it is reasonably

clear that as it is settled by the agreed statement of facts the Company is not a public utility corporation of the character described in said subdivision (b) of Section 4, payments to it under its contracts with the oil lease and fee owners, so far as the four items aforesaid are concerned, are not taxable.

Several principles of statutory construction may properly be invoked to reach this conclusion. Expressio unius est exclusio alterius. Also "where in the enactment of a law the legislature employs in a subsequent clause of the same Act, or in later legislation on the same subject, language clarifying a doubtful expression theretofore used, the court should give the language the meaning the legislature intended." Moore v. Pleasant Hasler Construction Co., supra, and cases cited. Additionally, it is well settled that "all doubts as to the construction of revenue statutes must be resolved in favor of the taxpayer and against the taxing power." 59 C. J. 1131-1133 and cases cited.

Items or transactions Nos. 5, 6, 7, 8, 9, 10, 11 and 12 are described in the Company's amended pleading and the rulings of the Board as:

"5. Gathering and transportation of crude oil purchased by The Stanolind in the Salt Creek Field and sold and delivered to The Standard Oil Company f. o. b. Casper is subject to the sales tax."

"6. The gathering and transportation of crude oil purchased by the Stanolind in the Salt Creek Field and sold and delivered to Socony Vacuum Oil Company at the latter's refinery at Casper, Wyoming, is subject to the sales tax."

"7. The gathering and transportation of crude oil purchased by The Stanolind in the Salt Creek Field and delivered to The Texas Company at the latter's Casper refinery is subject to the sales tax."

"8. The gathering by The Stanolind Oil and Gas Company of its own oil in the Frannie Field and loading same on cars for shipment to Greybull Refinery of Standard Oil Company is subject to the sales tax."

"9. The gathering of crude oil purchased by The

Stanolind in the Hamilton Dome Field into tanks from which same is transported to Greybull Refinery by Illinois Pipe Line Company is subject to the sales tax."

"10. The transportation of crude oil purchased by The Stanolind in the LaBarge Field and moved through its own pipe line for sale and delivery to Utah Oil Refining Company at Opal Railroad Siding for continued movement out of the state is subject to sales tax."

"11. Transportation by pipe line of casing head gasoline from Stanolind Oil and Gas Company's Salt Creek Gas Plant for sale and delivery to Standard Oil Company at a specified price f. o. b. Casper is subject to the sales tax."

"12. Transportation by pipe line of gas purchased by The Stanolind Oil and Gas Company in the Wertz-Ferris and Mahoney Dome Fields to Casper for sale to Standard Oil Company is subject to the sales tax."

The stipulated facts as to these items, each and all relating to transactions during the month of April, 1937, are substantially as follows: As to item No. 5—That the Company purchased a quantity of crude oil in the Salt Creek Oil Field in Natrona County, Wyoming, and paid the producer thereof the posted field price therefor; that the Company owns a pipe line for running its own oil from that Field to the refineries located at Casper in Natrona County, Wyoming; that this crude oil was run through this pipe line to the refinery belonging to the Standard Oil Company of Indiana, where it was sold and delivered to the latter pursuant to contract, at an agreed price per barrel; that a reasonable rate during the period aforesaid for carrying such oil "by common carrier" between said Oil Field and Casper was twenty cents per barrel.

As to items Nos. 6 and 7—Other than the names of the refinery purchasers of the crude oil, the agreed facts relative to said items appear to be similar to those detailed concerning item No. 5 as above set forth.

As to item No. 8—That the Company produced crude oil in the Frannie Field in Park County, Wyoming, and gathering a quantity thereof through its own pipe

lines and facilities loaded it on tank cars of the Standard Oil Company at Frannie Station on the Chicago, Burlington & Quincy Railroad for further movement to the Standard Oil Company's refinery at Greybull, Wyoming; that this oil became the property of the purchaser when loaded upon these cars, the price paid therefor being the agreed price "loaded in said tank cars at Frannie Station"; that for the service of carrying this crude oil by a common carrier between the oil field and the loading place a reasonable rate was five cents per barrel.

As to item No. 9—That the Company purchased quantities of crude oil from sundry producers in the Hamilton Dome Field in Wyoming, paying therefor the posted field price, and gathered such oil from the tanks of such producers through the Company's own pipe lines into a central tank in the field, whence it was delivered to the Illinois Pipe Line Company for transportation and sale to the Standard Oil Company's refinery at Greybull, Wyoming; that the Company paid the Illinois Pipe Line Company its regular charge for transportation of said oil to said refinery; that the sale price to the Standard Oil Company was at an agreed price per barrel, which included the pipe line transportation cost and marketing charge; that five cents per barrel was a reasonable rate during the period aforesaid for the service of carrying this oil by common carrier between the "points stated."

As to item No. 10—That the Company purchased for itself quantities of crude oil from various producers in the LaBarge Oil Field in Wyoming at the posted field price; that the Company owns and operates a pipe line for transporting said oil from said field to the Opal loading station on the Union Pacific Railway; that the Company ran the oil so purchased through said pipe line in filling orders from the Utah Oil Refining Company, operating a refinery at Salt Lake City, Utah,

such oil being loaded at Opal Station into tank cars of the Utah corporation for through shipment to said refining company in Salt Lake City; that this oil was paid for by the corporation last mentioned at an agreed price per barrel, f. o. b. said cars, said price including the amount thus paid the oil producers and a fixed amount on account of gathering and running said oil; that title to the oil passed to the Utah Oil Refining Company when delivered at the Opal Station aforesaid, where it was billed and shipped to the Utah Oil Refining Company; that the oil thus bought by the Utah corporation became an "ingredient and component part" of the gasoline and other petroleum products manufactured for sale by said Company; that the reasonable rate for the service of carrying said oil by a common carrier between the stated points was forty cents per barrel.

As to item No. 11—That the Company owned a quantity of casing head gasoline in the Salt Creek Oil Field, aforesaid, which it ran through its own pipe line to the oil refineries of the Standard Oil Company of Casper, Wyoming, and there delivered and sold it to said last mentioned company; that a reasonable rate for the service of carrying this gasoline by common carrier between said Field and Casper was twenty cents per barrel.

As to item No. 12—That the Company bought a quantity of natural gas in the Wertz-Ferris and Mahoney Dome Fields, at the field price, and ran it through a pipe line in which it and another corporation each had an undivided one-half interest, to the refinery of the Standard Oil Company at Casper, Wyoming; that at the place last mentioned it sold and delivered said gas to the said Standard Oil Company, which was used and consumed by that corporation in its business of manufacturing gasoline and other petroleum products, the expense of transporting said gas from the

field to the refinery aforesaid being included in the sale price thereof; that the Company paid to its co-owner for the use of its one-half interest in said pipe line in moving said gas a fixed rate, but made no payment to itself for running its own gas through its own line; that the reasonable rate for the service of carrying said gas by common carrier between the said points was three and one-half cents per thousand cubic feet of gas.

Supplementing the agreed facts detailed as above as to each of the items aforesaid Nos. 5 to 9, inclusive, and No. 11, the following additional facts were stipulated: That all the crude oil and casing head gasoline sold to the several companies in these items mentioned were utilized by the several respective purchasers or their vendees in the manufacture of gasoline and other petroleum products in the refineries of such purchasers or their vendees within this State, and this oil and casing head gasoline became an ingredient and component part of the gasoline and other products "refined, compounded and manufactured" by said purchasers for sale in the regular course of their business, and the cost thereof became a part of the sale price of the gasoline and other petroleum products manufactured therefrom.

As to these several items numbered 5 to 12, inclusive, the contention of the Company is that in each instance it carried its own oil, gas or gasoline in its own pipe line, or by its own hired agents, and that no amount was paid to it for transportation of such oil. The position of the Board would appear to be that the difference between the price of the oil in the fields where it was produced and the sale price where sold should be considered the "transportation charge." The trouble with the last mentioned contention is that the record does not bear out such an argument. There is nothing in it indicating that any amount whatsover

was paid to the Company for transporting the oil or that any part of the purchase price when the oil was sold included transportation cost, except in the case of items numbered 9, 10, and 12, and concerning these transactions the several amounts thereof are not given. We are unable to see that it would make any difference in the result to be reached in the case at bar if they were; so far as can be told from the facts before us, aside from the items mentioned, that may or may not be true. The tax is imposed (Section 4 (b), supra,) as "an excise tax equivalent to two per cent * * * of the amount paid: (1) to carriers * * * defined by the Constitution of the State of Wyoming and also as defined by law * * * for all transportation, telephone service," etc. The law does not say that a tax shall be imposed upon the reasonable value of the transportation service. The tax is laid upon the "amount paid." Additionally, so far as the items last above mentioned are concerned, we are unable to perceive that the Company was a carrier within the terms of the Selective Sales Tax Act.

It is true Section 7 of Article X of the Wyoming Constitution provides that:

"All corporations engaged in the transportation of persons, property, mineral, oils, and mineral products, news or intelligence, including railroads, telegraphs, express companies, pipe lines and telephones, are declared to be common carriers."

We hardly think that this language was intended by the framers of our fundamental law to cover transportation of oils or intelligence, etc. for the corporation's own purposes only. If this were not so then telephone and telegraph lines of a railroad used for dispatching its trains and the road's general business would have to be regarded as common carriers and obligated to receive messages for the general public. This is not true, and could not be, without throwing the individual

business of the corporation into confusion. "One can not properly be said to be engaged in a business unless there is to some extent a continuous occupation of his faculties and powers directed toward the carrying on of the business as an object or purpose." Fleckenstein Bros. Co. v. Fleckenstein, 66 N. J. Eq. 252, 57 A. 1025-1027; Head v. New York Life Insurance Co., 43 Fed. (2d) (C. C. A.) 517-520. In the case at bar the Company was in no sense occupied continuously with its facilities in carrying oil for the general public.

Where a federal statute (Act of Congress June 29, 1906, Ch. 3591, 34 Stat. at L. 584,) provided:

"That the provisions of this act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this act,"

the national court of last resort in the Pipe Line Cases, 234 U. S. 548, 34 Sup. Ct. Rep. 956, 58 L. Ed. 1459, unanimously affirmed a decree of the United States Commerce Court enjoining the enforcement of an order of the Interstate Commerce Commission requiring the Uncle Sam Oil Company, owning a certain oil pipe line, to file with the Commission a schedule of rates and charges for transportation. Concerning the company last named, Mr. Justice Holmes said:

"There remains to be considered only the Uncle Sam Oil Company. This company has a refinery in Kansas and oil wells in Oklahoma, with a pipe line connecting the two which it has used for the sole purpose of conducting oil from its own wells to its own refinery. It would be a perversion of language, considering the sense in which it is used in the statute, to say that a man was engaged in the transportation of water whenever he pumped a pail of water from his well to his house. So as to oil. When, as in this case, a company

is simply drawing oil from its own wells across a state line to its own refinery, for its own use, and that is all, we do not regard it as falling within the description of the act, the transportation being merely an incident to use at the end."

Mention is made by counsel for the Board of Section 94-101, W. R. S., 1931, which in part reads:

"The term 'public utility,' when used in this chapter, shall mean and include every person, or municipality, that owns, operates, leases, controls, or has power to operate, lease or control: * * *

"(g) Any plant, property or equipment for the transportation or conveyance to or for the public of oil or gas by pipe line."

This provision amplifies and clarifies the constitutional provision above quoted if there was any doubt as to its true intent and purpose. It is plain from the agreed facts that the Company in the instant litigation does not operate its pipe lines "for the public" but for itself and cannot in any sense be a "public utility" within the definition given.

Counsel for the Board urge that "the mere ownership of the pipe line equipment is enough to constitute a public utility." No authority for such a position is drawn to our attention, and the contention must be regarded as unmeritorious. If such a view were upheld it would lead to extremely strange consequences to say the least.

The following three listed items each embody transactions also occurring during the month of April, 1937. Item No. 14, described in plaintiff's amended petition and the ruling of the Board, is:

"Sales of crude oil to Tulsa (Wyo.) Light and Power Company and Blackman and Son are subject to the sales tax."

As to this item the agreed facts are in brief: That the Company sold crude oil to the Tulsa (Wyo.) Light

and Power Company and to Blackman & Son for fuel for "generating electric energy and current generated by them" at a fixed price.

The Board contends that generating electricity is not "manufacturing" and therefore is not exempt under Section 2 (f) of the Selective Sales Tax Act, supra. Some authorities are cited to that effect. But we think the better reasoning and authorities, as well as the more modern ones, are opposed to this view. People v. Wemple, 129 N. Y. 543, 29 N. E. 808; In re Charles Town Light & Power Co., 183 Fed. 160; Beggs v. Edison, etc. Co., 96 Ala. 295, 11 So. 381; Kentucky Electric Co. v. Buechel, 146 Ky. 660, 143 S. W. 58; Burk v. Mead, 159 Ind. 252, 64 N. E. 880 at 883; Vencedor Inv. Co. v. Highland Canal & Power Co., 125 Minn. 20, 145 N. W. 611; McMillan v. Noyes, 75 N. H. 258, 72 A. 759; Bates Machine Co. v. Trenton & N. B. R. Co., 70 N. J. L. 684, 58 A. 935; Angola Ry. & Power Co. v. Butz, 52 Ind. A. 420, 98 N. E. 818; 9 R. C. L. 192.

Item No. 16, described in plaintiff's amended pleading and the ruling of the Board is:

"Electric power service furnished Standard Oil Company by the Stanolind Oil and Gas Company and used for lighting purposes at Casper refinery is subject to the sales tax."

The agreed facts concerning this item are in substance these: That the Company furnished and delivered to the Standard Oil Company of Indiana electric power; that this was used by that company in its oil refinery for the light and power required by it in "manufacturing" crude oil into gasoline, lubricating oils and other petroleum products; that the amount charged and which the Standard Oil Company, aforesaid, agreed to pay was a stated amount; that the Company during the period aforesaid never owned or operated any plant for selling or furnishing to the public elec-

tricity for light, heat or power; that the Company made wholesale sales of electricity to the Shannon Gas & Electric Co. and Mountain States Power Co. only, and the rest of the electricity produced by the Company was used solely by it in performance of its own contracts with lease owners and in the operation of its own plant and facilities; that the Company has never offered to furnish the public with electric power; that the Company has never posted or filed rates for furnishing such power, has never held itself out as furnishing or soliciting customers, and therefore never subjected its plant to the control and supervision of the Public Service Commission of Wyoming, nor has said Commission demanded that it do so as a public utility.

The Board concedes that this transaction "is covered by Section 2 (f) of the Act," supra, which is to the effect, as already indicated, that power "consumed directly in manufacturing" is exempt from taxation. The claim is, however, that power for lighting purposes is not consumed "directly" in "manufacturing." No authorities are cited. However, the agreed facts themselves destroy this contention, as it is expressly stipulated therein that the lighting produced by the supplied power was required in "manufacturing." Furthermore, we are inclined to agree with counsel for the Company in the statement that, "Whether the energy mentioned was used for power to revolve mechanical devices used in manufacturing, or to light the operation and to assist the workmen in carrying out these processes, can make little difference. In either instance the energy was used as directly in manufacturing as the needs could possibly afford. When light was needed it was just as impossible to do the work incident to manufacturing crude oil into gasoline at night without light as it was to provide the necessary power for this purpose."

Item No. 17 listed in plaintiff's amended petition and the ruling of the Board, is:

"Gathering of crude oil in the Salt Creek Field and the transportation thereof by pipe line to Casper for loading in tank cars for shipment out of Wyoming, for Continental Oil Company is subject to sales tax."

Relative to this item the agreed facts are concisely: That the Company gathered crude oil in the Salt Creek Oil Field, aforesaid, belonging to the Continental Oil Company, and the defendant in error transported said oil through the latter's pipe lines from said field into receiving tanks at Casper, Wyoming, from which the oil so transported was loaded upon tank cars of the Continental Oil Company and shipped by that corporation to its refinery at Denver, Colorado; that the oil thus shipped was "definitely committed" for through shipment at the time it left the said field; that this crude oil thus transported became an "ingredient and component part" of the gasoline and other petroleum products manufactured by said Continental Oil Company for sale in due course of its business; that the company last mentioned paid the defendant in error for "gathering and transporting" said crude oil, as outlined above, a stated sum of money.

The claims of the defendant in error are that this item was exempt from taxation under the Act aforesaid (see express provisions of the proviso, Section 4 (b) (1) supra,) and also Section 6 of the Act aforesaid, providing in part, "all sales which the State of Wyoming is prohibited from taxing under the constitutions or laws of the United States, or of the State of Wyoming, shall be exempt from taxation under this Act," because it was (1) an interstate movement of freight, and (2) that any tax would be unconstitutional as impairing the obligation of contract. The response of the Board in answer to these claims is as to reason numbered (1) that there is no joint rate between the

pipe line company and the railroad company and the pipe line transportation involved in the item is an intrastate movement only. As to the second reason suggested by the Company, it is urged for the Board that there is nothing in the agreed facts to indicate that the transaction sought to be taxed was the result of or was by virtue of a contract entered into prior to the passage of the Sales Tax Act.

A careful inspection and study of the agreed facts as to item No. 17 has convinced us that the stipulated facts are altogether too meager to enable the district court or this court to properly determine the contentions of the parties. Additionally, it is not at all clear as to what is meant by some expressions contained in said statement. For example the term "definitely committed" for through shipment at the time the oil left the field, does not, we take it, aid materially in determining the true nature of the transaction. Accordingly, having in mind the contentions of the parties and the status of the agreed facts submitted as to this item, we think much more exact justice as to all parties concerned will be accomplished by modifying the judgment below, so as to require a new trial concerning this item and by affirming it as to all others involved herein.

Other questions have been argued and we have given them all due consideration. However, we deem it unnecessary to lengthen this opinion by further discussion. The views above expressed indicate the disposition of the cause to be made at this time as hereinbefore announced.

*Modified and affirmed.*

KIMBALL, J., and BURGESS, D. J., concur.